Bill KNAPP and Dorothy C. Knapp,
Plaintiffs in Error,

v.

ARKO INTERSTATE ELECTRIC CO., Inc.,
Brice Callahan, the Acme Brick Company,
Osburn Builders, Inc., Hope Lumber and
Supply Company, Otto Morgan, Ready-Mix
Concrete Company, Inc., B. G. Woods, Wil-
liam M. Ball, Defendants in Error.

No. 41684.

Supreme Court of Oklahoma.

Dec. 23, 1968.

Kay Wilson, Jr., Muskogee, for plaintiffs in error.

Joe H. Kennedy, Joe R. Kennedy, Muskogee, for defendant in error, Ready-Mix Concrete Co.

Ernest Anthis, Jr., Muskogee, for Hope Lumber and Supply Co., and Brice Callahan.

Fite, Robinson & Summers, Muskogee, for William M. Ball, and B. G. Woods.

Paul Ferguson, Muskogee, for Otto Morgan.

Franklin Wilder, Ft. Smith, Ark., for Arko Interstate Electric Co., Inc.

Fred W. Martin, Wagoner, for Acme Brick Co.

LAVENDER, Justice.

This appeal is concerned with a judgment of the District Court of Muskogee County establishing liens claimed under the provisions of 42 O.S.1961, § 143 against certain real property located in that county.

Under date of October 18, 1961, Bill Knapp, one of the plaintiffs in error, as "owner," entered into a written contract with Osburn Builders, Inc. (hereinafter called "Osburn" or the "contractor"), by the terms of which Osburn contracted to construct a house and garage on the land in question, according to the plans and specifications therefor as prepared by one George C. Dewel, as architect for the owner, and to complete the same within 90 workable days thereafter, for the sum of $27,618.00, payable in four installments: $2,135.00 when footing and foundation walls are in place; $11,970.25 when the house has been enclosed, roof in place, cornice and any siding in place, and has had prime coat of paint, plumbing roughed in, wiring roughed in, heat ducts in place, garage floor in place, wall ties for brick and flashing in place, and wall installation in place; $1,733.00 (which would bring the total payments to $15,838.25) when attic insulation is in place, sheetrock in place and joints "taped out," and all of the heating equipment in place and working, with the balance due and payable within fifteen

days after completion and acceptance of the job. Thereafter, by written change orders, the contract price was increased by $372.57 to $27,990.57.

The contractor employed a number of workmen on the project, purchased materials from various suppliers, and subcontracted various portions of the contract work. Prior to completion of the contract work, and on or about March 23, 1962, the contractor stopped work on the project and, as a result thereof, the owner caused to be served on the contractor on April 2, 1962, the following notice:

"NOTICE

"To: Osburn Builders, Inc.

"Take notice that unless within ten days you resume work on that certain contract entered into between you and me on the 18th day of October, 1961, and complete the same with reasonable diligence and in a workmanlike manner, I will declare the said contract terminated and employ another contractor to complete the same, and deduct from payments which would otherwise become due to you the amount necessary to pay such other contractor and all bills for labor and material heretofore incurred by you. This action on my part is occasioned by the fact that you have done nothing toward completing the contract since March 23, 1962, and I interpret your inaction as an abandonment of the contract by you. The ten day period referred to above will comence to run from the date service of this notice is made upon you."

Then, on April 5, 1962, an instrument signed by the contractor and reading as follows was served upon the owner:

"ANSWER TO BILL KNAPP'S NOTICE

"Osburn Builders Inc., denied it has breached the contract and requests that Bill Knapp comply with said written contract and specifications in the following respects to wit:

"1. That Bill Knapp makes adjustment for excavation of solid rock for storm cellar (original plans) 2' depth x 15' width x 27' length (29 cu. yds. at $30.00) ----------------------------------------$870.00

"2. That Bill Knapp makes adjustment for excavation of solid rock in footings (6 cu. yds. at $30.00) ------------------------- 180.00
 General specifications Paragraph 1, Line 4 'Contractor to examine site and satisfy himself of all conditions'
 (Bill Knapp assured W. Guy Osburn that he and Rufus Horn had drilled holes all over the property and had not hit any rock)

"3. That Bill Knapp pays for planter box not shown on the set of plans used by W. Guy Osburn to figure the estimate for the job. (material & labor) --------------------------------- 27.00

"4. That Bill Knapp accepts the present brick work that has been completed to date (approximately 40% complete). Brick work complies with the terms of the contract and general specifications in that it would be acceptable to Federal Housing Administration and would pass their requirements. (general speci-

fications Paragraph 6, line 5), and Osburn Builders Inc., *demands* that Bill Knapp does not disturb the brick work done hereunder until all payments due under this contract have been paid to him.

"5. That Bill Knapp extends the completion date 45 workable days from the date this disagreement is settled.

"6. That Bill Knapp pays an adjustment for brick work delays & damage caused by demands he made in excess of contractual obligations:

| | |
|---|---|
| Materials | $225.00 |
| Labor | 314.00 |

- - - - - - - - - - - - - - - - - -539.00

"7. That Bill Knapp pays for changes he has authorized in plans & specifications to wit:

Change in plans (Storm cellar to fall out shelter) increased depth 2′ in solid rock (29 cu. yds. at 30.00) - - - - - - 870.00
Changed Plumbing Contractors - - - - - - - - - - - - - - - - - - - - - - 25.00
Waterproofing added to cement - - - - - - - - - - - - - - - - - - - - - 24.00
Sheetrock garage walls - - - - - - - - - - - - - - - - - - - - - - - - - - - - 86.29
Waterproof membrane - - - - - - - - - - - - - - - - - - - - - - - - - - - - - 83.14
Living room cabinet - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - 144.72
Moving dishwasher space - - - - - - - - - - - - - - - - - - - - - - - - - - 12.00
Adding cabinet door on family room side - - - - - - - - - - - - - - 11.50
Demanding better masonry job than specified (increased labor contract 25.00/m) 17,000 at 25.00/m - - - - - - - - - - - - 425.00

Total - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -$3294.65

"Upon acceptance and compliance with these terms and payment for these adjustments and changes Osburn Builders Inc., will resume work and complete the job."

———◆———

The owner did not comply with these conditions so specified by the contractor, but had the architect named in the original contract inspect the work done by the contractor and specify what would be necessary to complete the contract work in accordance with the plans and specifications, and received three bids on the work so specified by the architect and entered into a contract with the lowest of the three bidders, one Harold B. Greene, to do that work for $12,159.00. That contract was fully performed by Greene, and the owner paid him the agreed price of $12,159.00.

As of March 23, 1962, when Osburn stopped work under its contract, the owner had paid to Osburn, or to Osburn and various subcontractors (who cashed the joint-payee checks involved) a total of $15,812.-65, some of which had been used to reduce the total bills of subcontractors and materialmen, and $5,457.79 of which had been used to pay, in full, all of the workmen that had been employed by the contractor.

Three companies that had furnished materials to the contractor (Acme Brick Company, Hope Lumber and Supply Company, and Ready-Mix Concrete Company), and four subcontractors (William M. Ball d/b/a Aircon Supply Company, Brice Callahan, Otto Morgan d/b/a Morgan Decorating Company, and B. J. Woods), filed lien statements as provided for in 42 O.S. 1961, § 143, and all of them (as well as Arko Interstate Electric Company, as assignee of $802.95 of Callahan's claim in

connection with its bill in that amount for materials and labor furnished to Callahan in the performance of his subcontract) became parties to the proceedings brought in the trial court by Callahan against the contractor and the plaintiffs in error herein. Each of them, except Otto Morgan, sought judgment against the contractor and the Knapps for the unpaid balance of his or its contract or account, with interest thereon at the rate of six per cent per annum from the date the last material or labor was furnished, and costs including an attorney's fee, and the establishment, and foreclosure, of a lien in accordance with such a judgment. Otto Morgan prayed for the same relief except that he did not pray for judgment against the contractor.

In its answer and cross-petition, the contractor alleged that the sum of $15,500.00 was due it under its contract, and remained unpaid, and prayed for judgment against the Knapps in that amount, with interest and costs including an attorney fee, and also prayed that its judgment be declared a first and prior lien on the premises and be foreclosed.

The Knapps alleged the contract with Osburn, abandonment thereof by Osburn on or about March 23, 1962, the notice of April 5, 1962, and Osburn's failure to proceed in accordance with the contract and notice, the contract between Bill Knapp and Harold B. Greene for the completion of the contract work in accordance with the original plans and specifications, and payment of the contract price of $12,159.00. They also alleged payments to Osburn and to his employees, materialmen and subcontractors totaling $15,812.65, which, together with the $12,159.00 paid to Greene for completing the contract work, made their total payments some $379.42 in excess of the contract price of $27,990.57. They prayed that all of the claims be denied and that their title to the real property involved be quieted as against all such claims.

Actually, there were three separate actions but, prior to trial, the other two were consolidated with the one commenced by Brice Callahan. The consolidated action was tried to the court, without a jury.

In its journal entry of judgment, the trial court found that the balance of the original contract was $11,943.00; that the total judgments allowed the subcontractors could not, in any event, exceed that amount; that the original contractor claims an additional sum of $3,294.65 for extras over and above the amount claimed due under its contract, but that "this amount is not sufficiently substantiated by the evidence," and the contractor should not be allowed any lien; that the following-named subcontractors and materialmen had established their claims in the following amounts (the amount sued for by each) and should be allowed attorneys' fees in the following amounts:

| | Claims | Atty. Fees | Total |
|---|---|---|---|
| Brice Callahan Electric | $ 2,230.00 | $ 450.00 | $ 2,680.00 |
| Hope Lumber Company | 5,504.18 | 850.00 | 6,354.18 |
| Acme Brick Company | 973.52 | 200.00 | 1,173.52 |
| Otto Morgan | 900.00 | 200.00 | 1,100.00 |
| Aircon Supply | 1,733.52 | 400.00 | 2,133.52 |
| B. J. Woods | 150.00 | 100.00 | 250.00 |
| Ready Mix | 809.00 | 200.00 | 1,009.00 |
| | $12,300.22 | $2400.00 | $14,700.22 |

that Arko Interstate Electric Company is entitled to the sum of $802.95 and reasonable attorneys fees of $200.00, to be charged against Brice Callahan claim; that these

subcontractors and materialmen are not entitled to liens unless the contractor was in good faith and not responsible for the cessation of the work, and, if Osburn walked off the job arbitrarily and refused to continue, these claimants would not be entitled to liens, but that, in this case, Knapp and his architect made arbitrary and unreasonable demands on Osburn, and it was justified in demanding payment to complete the work and, therefore, was not the primary force in the work stoppage; and that, after the liens have been reduced to the amount recoverable, the claimants are entitled to the following amounts (which total $11,943.00):

| | |
|---|---|
| Brice Callahan Electric | $2,177.26 |
| Hope Lumber Company | 5,162.30 |
| Acme Brick Company | 953.43 |
| Otto Morgan | 893.72 |
| Aircon Supply | 1,733.31 |
| B. J. Woods | 203.16 |
| Ready Mix | 819.82 |

Then, without rendering any judgment in favor of the contractor against the Knapps or either of them, the trial court ordered, adjudged and decreed that "the balance due on the original contract is $11,943.00, and that the total amount of judgments rendered to the subcontractors cannot exceed said balance left on the original contract;" that Arko Interstate Electric Company have "judgment" in the amount of $802.95, and reasonable attorneys fees of $200.00, to be included in the judgment in favor of Brice Callahan and the judgment therein rendered in favor of Callahan to be apportioned between him and Arko; and further ordered, adjudged and decreed as follows:

" * * * that the following plaintiffs and defendants be and the same are hereby awarded judgments in the amounts set opposite their names, which judgments include interest and attorneys fees to the date of this judgment:

| | |
|---|---|
| "Brice Callahan | $2,177.26 |
| Hope Lumber Company | 5,162.30 |
| Acme Brick Company | 953.43 |
| Otto Morgan | 893.72 |
| Aircon Supply Co. | 1,733.31 |
| B. J. Woods | 203.16 |
| Ready Mix Concrete Co. | 819.82 |

"All of which judgments total $11,943.00. Said judgments shall bear interest from the date hereof until paid, and such judgments having been rendered, the defendants, Bill Knapp and Dorothy Knapp, except to the order of the Court and said exceptions are allowed."

Before discussing the contentions made by the appealing owners, we quote the pertinent provisions of 42 O.S.1961 §§ 141 and 143. Section 141 (not directly involved herein) provides:

"Any person who shall, *under oral or written contract with the owner* of any tract or piece of land, perform labor, or furnish material for the erection, * * * of any building, improvement or structure thereon, or perform labor in putting up any fixtures, machinery in, or attachment to, any such building, structure or improvements; or who shall build, * * * or furnish labor or material for buildings, * * * in or upon said land, * * * shall have a lien upon the whole of said tract or piece of land, the buildings and appurtenances. If the title to the land is not in the person with whom such contract was made, the lien shall be allowed on the buildings and improvements on such land separately from the real estate. * * *;"

(Emphasis supplied)

and Section 143 (divided herein for convenience and clarity) provides:

"Any person who shall furnish any such material or perform such labor *as a subcontractor, or as an artisan or day laborer in the employ of the contractor,* may obtain a lien upon such land, or improvements, or both, from the same time, in the same manner, and *to the same extent as the original contractor,* for the amount due him for such material and labor;

and any artisan or day laborer *in the employ of,* and any person *furnishing*

*material to, such subcontractor* may obtain a lien upon such land, or improvements, or both, [from] the same time, in the same manner, and *to the same extent as the subcontractor,* for the amount due him for such material and labor,

by filing with the clerk of the district court of the county in which the land is situated, within ninety (90) days after the date upon which material was last furnished or labor last performed under such subcontract, a statement verified by affidavit, setting forth the amount due from the contractor to the claimant, and the items thereof as nearly as practicable, the name of the owner, the name of the contractor, the name of the claimant, and a description of the property upon which a lien is claimed; and by serving a notice in writing of the filing of such lien upon the owner of the land, or improvements, or both; * * *.

Provided, further, that the owner of any land affected by such lien shall not thereby become liable to any claimant for any greater amount than he contracted to pay the original contractor.

*The risk of all payments made to the original contractor shall be upon such owner until the expiration of the ninety (90) days herein specified,* and no owner shall be liable to an action by such contractor until the expiration of said ninety (90) days,

and such owner may pay such subcontractor the amount due him from such contractor for such labor and material, and the amount so paid shall be held and deemed a payment of said amount to the original contractor." (Emphasis supplied)

(Prior to a 1957 amendment of Section 143, the 90-day period mentioned in that section was 60 days.)

█ One of the arguments of the plaintiffs in error (the "owner" and his wife) is to the effect that, since under the trial court's findings and judgment, the contractor was not entitled to recover anything under its contract with the owner and was not entitled to a lien upon the owner's property, and, under the evidence, had not substantially complied with the contract even as to the work done prior to abandoning the contract, and, therefore, was not entitled to anything under the contract or to a lien, none of the subcontractors or materialmen could be allowed a lien on the property, because of the provision in 42 O.S.1961, § 143 that the persons mentioned in that statute (subcontractors, materialmen furnishing materials to the contractor or to a subcontractor, and artisans and day laborers in the employ of the contractor or a subcontractor) may obtain a lien "to the same extent as the original contractor." They cite Holloman et al. v. Britton et al. (1959), Okl., 346 P.2d 941, and Gibson et al. v. S. E. Dunham d/b/a Independent Lumber Co. (1959), Okl., 346 P.2d 327, in support of that argument, but neither of those cases is in point herein.

In the Gibson case, the contract price for remodeling a house was $1,270. for a "turnkey job." The plaintiff lumber company furnished all of the materials used on the job. The contractor abandoned the contract before completing the contract work, and just prior to or at the time of doing so had the owner make out a $1,000. check to the materialman, who used $750. thereof to pay off all of the workmen who had been employed by the contractor, and credited the remaining $250. on its own material account with the contractor. Then, without any request from or agreement with the owner, the materialman proceeded to complete the contract work. The owner paid the materialman an additional $270. as the balance of the contract price. The materialman filed a lien statement, and action, claiming a lien in the amount of $350. ($50. of which represented materials furnished after the materialman took over the job) as the unpaid portion of its total bill for materials used on the job, and the trial court established a lien in the amount of $350. This court reversed the judgment of the trial court, holding that the materialman was not entitled to any lien

because the owner had paid the full contract price and, under 42 O.S.1961, § 143, liens under that statute are limited to "the price stipulated in owner's contract with contractor." Without approving or disapproving that construction of the provision in 42 O.S.1961, § 143 that "the owner of any land affected by such lien shall not thereby become liable to any claimant for any greater amount than he contracted to pay the original contractor" (see the Klein, Uhrich, Seidenbach, Shugart, and Richardson cases, hereinafter discussed), we think that the result was correct. The owner in that case had paid the full contract price to the plaintiff-materialman and it saw fit to pay all of the contractor's workmen in full. In the circumstances (in which the plaintiff, in effect, became the contractor and, therefore, not entitled to any more than the contract price, regardless of the total cost of performing the contract), it was not the fault of the owner, but the fault of the complaining materialman, if it did not receive its proper portionate part of the contract price. There is no comparison between the fact situation in that case and the fact situation involved in the present case.

In the Holloman case, the property owner contracted for the construction of a barn for the sum of $3,500; the contractor subcontracted the entire job to the plaintiff in that case for the sum of $3,600; the subcontractor purchased materials in the amount of $2,002.74 from a lumber company, all of which went into the construction of the barn. When the barn was completed, the owner of the property refused to accept it or to pay anybody anything (except for $500. that had been paid to the contractor at the time of signing the contract), on the ground that the materials furnished by the lumber company and workmanship used in the construction of the barn did not meet the contract plans and specifications. This defense was interposed in an action in which the subcontractor sought judgment and a lien in the amount of $3,600. and the materialman sought judgment and a lien in the amount

of $2,002.74. The trial court found that the evidence established defective materials and workmanship sufficient to reduce the materialman's claim to $1,252. and the subcontractor's claim (minus the materialman's claim) to $498, which made the sum of their claims as allowed by the trial court of $1,750. or exactly one-half of the original contract price. On appeal, this court reversed the trial court with directions to enter judgment for the defendants, holding that, because of the defects found by the trial court, with such finding being sustained by the evidence, the contractor would not be entitled to recover anything under his contract because he had not substantially complied with his contract, and, therefore, because of the provision of 42 O.S.1961, § 143 mentioned by the plaintiffs in error in the present case, neither the subcontractor nor the materialman could be allowed a lien upon the land involved. In the present case, as in the Klein, Uhrich, Seidenbach, Shugart, and Richardson cases, hereinafter discussed, the building had not been completed by the contractor and the property owner did not refuse to accept what had been done but had the contract work completed and in effect, accepted the work theretofore done by the contractor, without (according to the Klein case) waiving any rights he might have against the contractor. Again, there is no comparison between the situation involved in the case relied upon and the situation involved in the present case.

This first-mentioned argument of the plaintiffs in error cannot be sustained.

Plaintiffs in error also argue that, although the Acme Brick Company (which last furnished materials to the contractor on March 20, 1962) filed a proper lien statement in the office of the court clerk on May 28, 1962, well within the 90-day period allowed therefor, and on November 5, 1962, commenced one of the separate actions against the contractor and the plaintiffs in error which were consolidated with the Callahan case, and caused summons to be served upon each of the plaintiffs in error on November 6, 1962, the brick company did

not serve upon the plaintiffs in error as owners of the land and improvements involved, a notice in writing of the filing of such lien statement, as required by 42 O.S. 1961, § 143, and, therefore, is not entitled to any lien upon the property.

■ We think that the provision in 42 O.S.1961, § 143 (immediately following the provision for filing a lien statement in the office of the county clerk within 90 days after furnishing the last material or labor) for service upon the owner of the land, or improvements, or both, of "a notice in writing of the filing of such lien" is related to the provision in the same statute that "The risk of all payments made to the original contractor shall be upon the owner until the expiration of the ninety (90) days herein specified;" and that the purpose of the first-mentioned provision is to protect the owner against making any payment to the contractor after such a lien statement has been filed without knowing that a lien upon the property is being claimed under that statute.

In the present case, the owner has made no payment whatsoever to the contractor since the brick company's lien statement was filed, so has suffered no detriment or prejudice by reason of the brick company's failure to serve him with written notice of the filing of its lien statement prior to commencing its action to enforce the lien claimed by it within five months after the expiration of time for filing such a lien statement. Except with respect to the time element, the situation is much the same as one of the situations involved in Thacher v. International Supply Co. et al. (1936), 176 Okl. 14, 54 P.2d 376, wherein this court held that in such circumstances the failure of the lien claimant to notify the owner of the filing of a lien statement, provided for in the statutes that now appear as 42 O.S.1961, §§ 144, 145, and 146, prior to commencement of the action to enforce such lien, did not preclude enforcement of the lien.

■ Under our view of the purpose of the provision in 42 O.S.1961 § 143 for the serving of written notice upon the owner of the property involved of the filing of a lien statement, the complete failure of the lien claimant to serve such a notice prior to the commencement of an action to enforce the lien would not preclude the establishment and enforcement of the lien, where, as here, such failure has not caused any detriment or prejudice to the owner. This argument of the plaintiffs in error cannot be sustained.

■ Plaintiffs in error contend that B. J. Woods cannot be allowed a lien because his lien statement, which was filed on May 21, 1962, was not filed within 90 days after doing his last work on a subcontract to do the finishing work on the flat concrete involved in the job for $150.-00. This contention seems to be based upon Mr. Woods' testimony that the work was done between February 1, 1962, and March 31, 1962 (which was in harmony with his lien statement); that he worked three days on the project (which the plaintiffs in error take to mean February 1st, 2nd, and 3rd, but Mr. Woods flatly denied this); and that he couldn't state the three days on which he did the work. However, Mr. Woods did testify, positively and without equivocation, that the last day he worked on this job was February 21, 1962. Whether a lien statement was filed within the statutory time limit is a question of fact to be determined from the evidence [Liberty Plan Company v. Francis T. Smith Lumber Company (1961), Okl., 360 P.2d 500, 505]. Under the uncontroverted evidence, the lien statement of B. J. Woods was filed on the 89th day of the 90-day period allowed therefor by 42 O.S.1961, § 143. This contention of the plaintiffs in error must be denied.

■ Plaintiffs in error also contend that the amount of the lien to be allowed William J. Ball d/b/a Aircon Supply Company must be based upon his subcontract with Osburn to furnish and install a particular brand and model of heat pump, as specified in the base contract, for $1,643.00, and not upon the total amount of $1,733.52 claimed

by Aircon. However, the evidence discloses that the additional $90.52 claimed by Aircon represents $71.52 for other appliances and materials furnished to Osburn and charged to it which were not included in the subcontract, and $19.00 for furnishing and installing wiring for the heat pump unit but not included in the subcontract for furnishing and installing the heat pump. This contention of the plaintiffs in error cannot be sustained.

Plaintiffs in error further argue that the situation in this case (if all lien claimants are not precluded from obtaining liens because the contractor is not entitled to recover anything on its contract and, therefore, is not entitled to any lien) is quite similar to the situation presented in the case of Consolidated Cut Stone Co. et al. v. Seidenbach et al. (1937), 181 Okl. 578, 75 P.2d 442; that the amount of the lien, if any, to be allowed each party claiming a lien herein under 42 O.S.1961, § 143 is to be determined by using the formula used by this court in the Seidenbach case, except that in addition to the items allowed in that case to the owner as credits against the contract price, the owner is entitled to credit, against the contract price, for his expenses in defending against such lien claims, because of a provision in 42 O.S.1961, § 173; and that, under the formula used in the Seidenbach case, as modified by allowing the owner credit for his expenses in defending against the lien claims, each of the lien claimants herein (except those who have not been paid anything on their total bills) has already received at least as much as the amount of the lien to which he or it would, in the absence of any payments on their total bills be entitled to obtain and, therefore, is not entitled to any lien.

The fact situations involved in J. B. Klein Iron & Foundry Co. v. A. B. Mays & Co. (1919), 76 Okl. 177, 184 P. 577; Uhrich Millwork Limited v. McGuire et al. (1930), 143 Okl. 16, 289 P. 264; and Shugart et ux. v. L. F. Platt Lumber Co. (1963), Okl., 379 P.2d 698, also cited by plaintiffs in error, were similar to the situation in the Seiden-

bach case. In Richardson et al. v. The H. E. Leonhardt Lumber Co. (1964), Okl., 389 P.2d 965, wherein the owner made no claim for damages for breach of the contract by the contractor but the contract price (without any credits to the owner for damages) was less than the sum of the total bills of all workmen, subcontractors and materialmen, this court used the same formula that was used in the Klein, Uhrich and Shugart cases in determining the amounts of the liens to be allowed the subcontractors and materialmen.

▮▮▮▮ Without herein setting forth the principles of law stated in such opinions, analysis of the opinions in the Klein, Uhrich, Shugart, Richardson, and Seidenbach cases reveals that in the actual application of those principles to the computation of the amount of the lien that any one entitled to a lien under the statute that now appears as 42 O.S.1961, § 143 (hereinafter referred to as "Section 143") may be allowed, it is first necessary to determine the amount of the lien he would be entitled to obtain if nothing whatsoever had been paid on his total bill, and then, if that amount would exceed the sum actually paid on his total bill, allow him a lien for the difference, but if that amount would not exceed the sum actually paid on his total bill, deny him any lien; and in determining the amount of the lien to which any particular lien claimant would be entitled if nothing whatsoever had been paid on his total bill, all of the computations are made as though nothing whatsoever had been paid to the contractor or to any of the persons mentioned in Section 143 and all of those persons had filed proper lien statements within the time allowed therefor by that statute and had served written notice of the filing of such lien statement upon the owner of the property, as provided in that statute, and all of such persons, and the contractor, as well as the owner of the property, were parties to the action to establish the liens.

▮▮▮▮ Under those cases, the first basic step is to determine the amount, if any,

which the contractor would have been entitled to recover from the owner under the contract as modified by proper change orders if nothing whatsoever had been paid to the contractor or to any of those mentioned in Section 143, and in determining that amount (hereinafter referred to as the "adjusted contract price"), there is deducted from the original contract price, as affected by proper change orders, the amount of damages growing out of the contract and/or contract work (including, but not necessarily limited to, damages for delay in the contract work, and the cost to the owner of having the contract work completed in accordance with the contract plans and specifications), which it is determined, under the pleadings and the evidence, the owner would have been entitled to set off against the contractor if nothing whatsoever had been paid to the contractor or to any of those persons mentioned in Section 143. Then, if the adjusted contract price be less than the sum of the total bills of all persons mentioned in Section 143, the court determines the proportionate part, or percentage, of his total bill for which each such person would have been entitled to a lien if nothing had been paid on the total bill of any such person. It is only then that amounts actually paid to a lien claimant are taken into consideration. If the amount so determined does not exceed the sum of the payments on his total bill, a lien claimant has received all that he is entitled to receive of the contract price and he is not entitled to a lien, but if the amount so determined does exceed the sum of the payments on his total bill, so that he has not received his proportionate part, or percentage, of the adjusted contract price, he is entitled to a lien in the amount of the deficiency.

In the present case, none of the parties contends that the bills of workmen are not entitled to a preference or priority over the bills of subcontractors and materialmen, but all of the parties who have filed briefs herein have proceeded on the theory that the bills of workmen are entitled to a preference or priority over the bills of subcontractors and materialmen, as in the Seidenbach case, and, for the purpose of this case, we shall proceed upon the same theory.

The argument of the plaintiffs in error that, in computing the amounts of the liens to be allowed subcontractors and materialmen, they are entitled to credit, against the contract price, for their expenses of defending against such lien claims, is based upon the provision in 42 O.S.1961, § 173 that, where an action to enforce such a lien is brought by a subcontractor, or other person not the original contractor, as in each of the three actions involved herein, "such original contractor shall be made a party defendant, and shall at his own expense defend against the claim of every subcontractor, or other person claiming a lien under this Chapter [Chapter 44, R.L.1910, which included the statutes now appearing as 42 O.S.1961 §§ 141, 142, and 143], and *if he fails to make such defense* the owner may make the same at the expense of such contractor; and until all such claims, costs and expenses are finally adjudicated, and defeated or satisfied, the owner shall be entitled to *retain from the contractor* the amount thereof, and such costs and expenses as he may be required to pay."

 Unlike the provisions of 42 O.S. 1961, § 143 which limit the property's liability toward those persons mentioned in that statute to the amount the owner of the property contracted to pay the original contractor, and the principle that, in computing that total liability, the amount that the owner contracted to pay the original contractor is to be reduced by the amount of any damages sustained by the owner which arise out of the contract or the contract work, the provisions of 42 O.S.1961, § 173 that are relied upon by the plaintiffs in error herein are not related to the original contract or the contract work or contract price. Most certainly, those provisions of Section 173 were not intended, and cannot be used, to reduce in any manner or to any extent the contract price or the property's liability to those persons who are mentioned in Sec-

tion 143. This argument of the plaintiffs in error must be denied.

■ We think that the trial court's finding that the owners were primarily responsible for the work stoppage was erroneous, particularly since the contractor demanded, as a condition to his finishing the job, the payment by the owners of the sum of $3,294.65—an amount which the trial court found the contractor was not entitled to receive.

■ With respect to the cost of having the contract completed, the defendants in error (except the contractor, who did not file a brief herein, and the Acme Brick Company, which did not join in the joint brief of the other defendants in error and filed a separate brief), without contending that nothing needed to be done to complete the contract work after Osburn abandoned it, contend that the owner's contract with Greene concerning the completion of the buildings involved in the original contract called for much more than was required by the original plans and specifications as theretofore modified by proper change orders, and whether or not the Greene contract did do that (but especially if it did not), that the $12,159.00 price fixed in the Greene contract and paid to Greene by the owner, was far in excess of the reasonable cost of completing the original contract in accordance with the plans and specifications. The evidence on those points was conflicting and as hereinabove pointed out, the trial court did not consider or pass upon the question of what was the reasonable cost of having the original contract work completed in accordance with the plans and specifications. This means, of course, that the cause must be remanded to the trial court for a determination of that question and for a determination of the amounts of the lien, if any, to which each party claiming a lien under 42 O.S.1961, § 143 is, in view of that basic determination, entitled.

Since the cause must be remanded to the trial court for a determination of those issues, and it is impossible to be certain, from the journal entry of judgment involved in this appeal, whether the judgments rendered in favor of the lien claimants other than the original contractor were intended to include personal judgments against the plaintiffs in error as prayed for by those claimants, we call the trial court's attention to such cases as Alberti v. Moore et al. (1908), 20 Okl. 78, 93 P. 543; Seran v. Rose et al. (1923), 93 Okl. 192, 219 P. 940; Sutherland Lumber Co. v. Gale et al. (1929), 136 Okl. 233, 277 P. 242, and Newman et al. v. Kirk et al. (1933), 164 Okl. 147, 23 P.2d 163, wherein it is held that in the absence of some contractual relationship with, or assumption of liability by, such owner a lien claimant is not entitled to a personal judgment against the owner of the property although he may be entitled to a lien upon the property.

The judgments of the trial court in favor of the defendants in error herein and against the plaintiffs in error herein are reversed and the cause is remanded to the trial court with directions to determine from the evidence adduced at the original trial of the cause the reasonable cost of having the project provided for in the contract between the plaintiff in error, Bill Knapp, and the defendant in error, Osburn Builders, Inc., as modified by proper change orders prior to the abandonment of such contract by Osburn Builders, Inc., completed, and allowing the plaintiffs in error credit, against the contract price, in that amount by way of damages for breach of such contract, and using the formula therefor used by this court in the case of Consolidated Cut Stone Co. et al. v. Seidenbach et al. (1937), 181 Okl. 578, 75 P.2d 442 (because all of the briefs herein proceed upon the theory that, as in that case, the bills of artisans and laborers mentioned in 42 O.S.1961, § 143 are to be treated as having a preference or priority over the bills of subcontractors and materialmen mentioned in the same statute), to establish, in the proper amount, the lien of each of the defendants in error who, under the

last-cited case, would be entitled to a lien under 42 O.S.1961, § 143.

JACKSON, C. J., IRWIN, V. C. J., and DAVISON, WILLIAMS and BERRY, JJ., concur.

HODGES, J., dissents.